## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **In re:** | ) | **Chapter 11** |
| | ) | |
| **MFM DELAWARE, INC.,** | ) | **Case No. 13-11359 (PJW)** |
| **MFM INDUSTRIES, INC.,**[1] | ) | **Case No. 13-11360 (PJW)** |
| | ) | |
| **Debtors.** | ) | **(Jointly Administered)** |
| | ) | |

## DEBTORS' EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 364 AND 507: (I) AUTHORIZING DEBTORS TO INCUR POST-PETITION SECURED INDEBTEDNESS PURSUANT TO SECTIONS 105 AND 364; (II) AUTHORIZING THE DEBTORS TO ENTER INTO CREDIT AGREEMENT WITH THOMAS KRAATZ; AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(C)

MFM Delaware, Inc. ("MFMD") and MFM Industries, Inc. ("Industries" together with MFMD, the "Debtors") each a debtor-in-possession, pursuant to sections 105, 364 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), hereby move this Court (the "DIP Motion") for the entry of interim and final orders authorizing the Debtors to incur post-petition secured indebtedness, authorizing the Debtors to enter into the Credit Agreement (as defined below); and scheduling a final hearing pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"). In support of the Motion, the Debtors rely upon and incorporate by reference the *Declaration of Matthew A. Crane in Support of First Day Motions and Applications* (the "Crane Declaration"). In further support of the Motion, the Debtors respectfully represent as follows:

---

[1] The last four digits of the taxpayer identification numbers of the Debtors follow in parentheses: (i) MFM Delaware, Inc. (3784); and (ii) MFM Industries, Inc. (6720).

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

2.      On May 28, 2013 (the "Petition Date"), each of the Debtors filed a voluntary petition with the Court under chapter 11 of the Bankruptcy Code.

3.      On the Petition Date, each Debtor filed a substantially similar motion with this Court seeking to have its bankruptcy case jointly administered with the other Debtor's case pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

4.      The Debtors have continued in possession of their properties and have continued to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.      On June 6, 2013, the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Creditors' Committee"). As of the date of this filing, no request has been made for the appointment of a trustee or an examiner.

6.      The Debtors' primary operating entity is a leading manufacturer and national supplier of private label cat litter products. Certain operational and liquidity issues forced the Debtors to file these Chapter 11 cases in order to preserve the fair market value of the assets.

## SUMMARY OF RELIEF REQUESTED

7.      Prior to the Petition Date, the Debtors used two primary sources of financing: (a) a receivables factoring facility with Bibby Financial Services (Midwest), Inc. ("BFS") with a

maximum facility amount of $3,000,000 secured by substantially all of the assets of Industries; and (b) a revolving credit facility with Crossroads Financial, LLC ("Crossroads") with a maximum facility amount of $500,000 secured by a first lien on inventory of Industries and substantially all of the other assets of Industries and MFMD. Further, as of the Petition Date, Palmer Resources, LLC (successor by merger to Palmer Companies, Inc.) ("Palmer") asserted junior liens on substantially all of the Debtors' personal property, and on certain real property owned by the Debtors.

8.      Through post-petition negotiations with their pre-petition lenders and thereafter with Thomas Kraatz ("Kraatz"), the Debtors have been able to reach agreements that allowed the Debtors to continue to operate their business. Crossroads and BFS agreed to continue providing financing to the Debtors pursuant to the pre-petition facilities, while Kraatz agreed to advance funds to the Debtors in exchange for a lien on certain funds that remained inaccessible to the Debtors due to an ongoing dispute with a judgment creditor, Terex Financial Services, Inc. In accordance with these agreements, the Debtors have been authorized by the Court's final order (the "Final DIP Order") to use cash collateral and to obtain post-petition financing. *See* Final DIP Order, Doc. No. 103 (July 16, 2013).

9.      Since that time, however, the Debtors have experienced a need for additional post-petition financing, for, among other things, to buy packaging materials in order to fulfill customer orders and thereby boost sales. Kraatz has agreed to extend this additional financing under the terms outlined below and stated in a credit agreement (the "Credit Agreement") to be attached to the Interim Order. This Motion is intended to ensure the continued stabilization of the Debtors' business.

10.     Accordingly, the Debtors request authority to enter into the Credit Agreement.

11.    In accordance with Bankruptcy Rule 4001 and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), below is a summary of the terms of the Credit Agreement:[2]

(a)    Amount:    Kraatz shall advance up to an aggregate of $500,000 in initial increments of $100,000, with later increments of $50,000.

(b)    Interest: 9% per annum.

(c)    Commitment Fee: $25,000 (5% of the loan amount) plus attorney's fees.

(d)    Use of Proceeds: The Debtors agree to use the proceeds solely to pay post-petition operating expenses in accordance with an approved budget.

(e)    Maturity: The Debtors' obligations under the Credit Agreement shall be due and payable on November 15, 2013. However, as a condition precedent to any sale of the Debtors' assets free and clear of Kraatz' liens and interests, the obligations must be repaid, unless Kraatz consents otherwise

(f)    Events of Default:    The Credit Agreement contains customary and appropriate events of default, including the Debtors' failure to operate in accordance with an approved budget.

(g)    Purpose: Amounts advanced under the Credit Agreement shall be used to provide additional working capital for, among other things, the purchase of packaging materials necessary to allow the Debtors to fulfill current demands and increase sales.

(h)    Priority and Liens:    All post-petition obligations of the Debtors under the Credit Agreement shall, subject to the Carve Out (as defined below), at all times: (i) pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to super-priority claim status in the chapter 11 cases (the "Kraatz Superpriority Claim"); and (ii) pursuant to section 364(c)(2), (c)(3), and (d) of the Bankruptcy Code, be secured by perfected liens (the "Kraatz DIP Liens") on substantially all of Industries' assets (other than claims or causes of action arising under sections 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code (collectively, the "Avoidance Actions")) (the "Collateral"); provided, however, Kraatz shall not have any liens in Accounts (as such term is defined by the Uniform Commercial Code in effect in Delaware) generated by the Debtors until BFS is indefeasibly paid in full after BFS announces its intent not to purchase additional Accounts. The Kraatz DIP Liens shall prime and be superior to any liens on the Collateral held

---

[2] Terms not defined in this summary are defined herein or in the Credit Agreement. The description contained herein of the terms of the Credit Agreement is: (a) intended as a summary of the terms expressly stated in the Credit Agreement; and (b) qualified in its entirety by the Credit Agreement. To the extent there is any discrepancy between this summary and the Credit Agreement, the Credit Agreement controls.

by Palmer Resources LLC (the "Palmer Liens"). Except for the Palmer Liens, the Kraatz DIP Liens shall not prime any valid, properly perfected and non-avoidable liens on the Collateral in existence as of the Petition Date, and the Kraatz DIP Liens shall be subject to the Carve Out. The Kraatz DIP Liens shall be junior in all respects to: (a) any and all liens on the Collateral held by BFS; and (b) any and all liens on the Collateral held by Crossroads. The Kraatz Superpriority Claim shall be otherwise junior to the Crossroads Superpriority Claim (as defined in the Final Ratification Order) and the Bibby Superpriority Claim (as defined in the Final Ratification Order) and shall not attach to or be paid from the Avoidance Actions or any proceeds thereof.

(i)    Rights and Remedies Upon Default: Kraatz' rights and remedies upon an Event of Default are set forth in the Credit Agreement. Prior to exercising any rights and remedies upon an Event of Default, Kraatz must first obtain relief from the automatic stay imposed by section 362 of the Bankruptcy Code.

(j)    Carve Out: The Kraatz DIP Liens and the Kraatz Superpriority Claim shall all be subject to and subordinate to a Carve Out (the "Carve Out") for: (a) statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and (b) the unpaid and outstanding reasonable fees and expenses incurred on or after the Petition Date, and approved or otherwise authorized by an order of the Bankruptcy Court pursuant to sections 326, 328, 330, or 331 of the Bankruptcy Code, (i) by the Debtors' attorneys retained with court approval by the Debtors in a cumulative amount not to exceed $100,000; and (ii) by the Committee's retained professionals in a cumulative amount not to exceed $50,000. The preceding sentence notwithstanding, under no circumstances shall any individual professional or professional firm other than King & Spalding LLP or the Debtors' Delaware bankruptcy counsel benefit from the provisions relating to "Carve Out" for the Debtors' attorneys.

(k)    Term: The Interim Order (as defined below) will terminate on the earlier of: (i) the date that is 45 days after the Petition date; or (ii) the date the Court enters a final order granting this Motion.

12.    The Debtors immediately need to obtain additional post-petition financing in order to provide working capital, for, among other things, the purchase of packaging materials necessary to allow the Debtors to fulfill current customer demands and increase sales. Without this additional post-petition financing, the Debtors will not have sufficient available sources of working capital to operate their businesses in the ordinary course for a period of time sufficient to maximize the value of their assets for the benefit of all stakeholders. In light of the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that entering into the Credit Agreement is critical to their ongoing operations and stability.

13.     The Debtors have sought this financing from Kraatz, as he has provided other financing to the Debtors in the past and is willing and able to meet the Debtors' immediate need. Based on the Debtors' financial condition and the existence of prior liens on the Debtors' assets, it is impossible to get debtor-in-possession financing on an unsecured basis. Due to the immediate need to obtain financing, it was impractical to seek financing from other sources. An entity that already had familiarity with the Debtors' operations was the logical source from which to seek additional financing.

14.     The Debtors have engaged in good-faith, arm's-length negotiations with Kraatz Palmer has advised Kraatz that it will subordinate its liens to those the Debtors intend to provide to Kraatz. The Debtors seek the entry of the interim order substantially in the form attached hereto as **Exhibit A** (the "Interim Order").

## LEGAL BASES FOR REQUESTED RELIEF

15.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. *See* 11 U.S.C. § 364(c).

16.     The credit provided under the Credit Agreement will provide the Debtors with essential working capital that will allow the Debtors to operate their businesses in an orderly and reasonable manner that will preserve and enhance the value of their assets and enterprise for the benefit of all parties in interest.

17.    Due to the liens that are already asserted on the Debtors' assets and their current financial condition, the Debtors believe that they would be unable to obtain unsecured credit or debt allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient to provide the needed working capital, nor would the Debtors be able to obtain post-petition financing from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought herein.

18.    In this challenging situation, the Debtors do not believe that they could obtain alternative or better financing than the terms provided by Kraatz. *See In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is available); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989) (noting that where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing").

19.    The Debtors moved quickly and in a targeted manner to assure that they would be able to expeditiously negotiate this additional post-petition financing. As described above, given the exigencies of the circumstances, the Debtors' management has concluded that the credit provided by Kraatz is the only alternative available under the circumstances. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See, e.g., Group of Institutional Investors v. Chicago, Mil., St. P., & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny

would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

20.     In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id.* at 513–14 (footnotes omitted).

21.     The proposed terms of the Credit Agreement are fair, reasonable and adequate and will provide that the security interests granted to Kraatz are subject to the Carve Out. Bankruptcy courts generally find that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel. *See, e.g., In Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

22.     Likewise, the commitment fee required by Kraatz is reasonable and appropriate under the circumstances. Indeed, courts routinely authorize similar lender incentives beyond the explicit liens and other rights specified in section 364 of the Bankruptcy Code. *See, e.g., In re Defender Drug Stores, Inc.*, 145 B.R. 312, 316–18 (9th Cir. BAP 1992) (authorizing credit arrangement under section 364, including a lender "enhancement fee").

23.     The Credit Agreement should be approved pursuant to section 364(e) of the Bankruptcy Code. Section 364(e) was designed to "encourage the extension of credit to debtors"

by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *See In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction that they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."); *see also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr. Mass. 1993) ("The purpose of section 364(e) is to allow good-faith lenders to rely upon conditions as the time they extend credit and to encourage lenders to lend to bankrupt entities.").

24.    The Credit Agreement was the result of good faith and arm's length negotiations, with all parties represented by counsel. As set forth above, the Debtors believe that the terms of the Credit Agreement are fair and reasonable under the circumstances, and that Kraatz is entitled to the benefits of section 364(e) of the Bankruptcy Code.

### PROVISIONS THAT IMPLICATE LOCAL RULE 4001-2(a)(i)

25.    A summary of certain terms of the Interim Order and Credit Agreement is set forth above as required by Bankruptcy Rule 4001. The Debtors do not believe that the Interim Order or the Credit Agreement contain any provision that requires special disclosure under Local Rule 4001-2(a)(i).

### NOTICE

26.    Notice of this Motion has been provided, either by facsimile, email, overnight courier or hand delivery, to (i) the United States Trustee for the District of Delaware; (ii) the Debtors' secured lenders and their counsel; (iii) counsel for the Creditors' Committee; (iv) Kraatz and his counsel; and (v) all parties who have filed notices of appearance and requests for

service of documents in these cases. The Debtors submit that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court:

(a)     enter the Interim Order substantially in the form attached hereto as **Exhibit A;** and

(b)     grant the Debtors such other and further relief as is just and proper.

Dated: August 6, 2013
        Wilmington, Delaware

Respectfully submitted,

/s/ Frederick B. Rosner
THE ROSNER LAW GROUP LLC
Frederick B. Rosner (No. 3995)
rosner@teamrosner.com
824 N. Market Street, Suite 810
Wilmington, Delaware 19801
Telephone:    (302) 319-6300

KING & SPALDING LLP
Arthur J. Steinberg
New York Bar No. 1680495
asteinberg@kslaw.com
1185 Avenue of the Americas
New York, NY 10036-4003
Telephone:    (212) 556-2158
Facsimile:    (212) 556-2222

Jeffrey R. Dutson
Georgia Bar No. 637106
jdutson@kslaw.com
Annie R. Carroll
Georgia Bar No. 127813
acarroll@kslaw.com
1180 Peachtree Street
Atlanta, Georgia 30309-3521
Telephone:    (404) 572-4600
Facsimile:    (404) 572-5131

*Co-Counsel for the Debtors-In-Possession*