## ASSET PURCHASE AGREEMENT

**THIS ASSET PURCHASE AGREEMENT** dated as of October __, 2013 (this "Agreement") is entered into by and between Tolsa USA, Inc., a Georgia corporation ("Purchaser"), and MFM Industries, Inc., a Delaware corporation and debtor in possession ("Seller"). Purchaser and Seller are sometimes individually referred to in this Agreement as a "Party" and collectively as the "Parties." Tolsa, S.A., a Spanish corporation ("Parent"), is a party to this Agreement solely for purposes of Sections 4 and 13.11 hereof.

### RECITALS:

**WHEREAS,** Seller operates a vertically integrated cat-litter production business consisting of mining and manufacturing various cat litter products and marketing such products to supermarkets and other customers (the "Business");

**WHEREAS,** Seller desires to sell, transfer, convey, assign and deliver the Purchased Assets (as defined below) and to assign the Assumed Liabilities (as defined below), and Purchaser desires to purchase, take delivery of, and acquire such Purchased Assets and to assume such Assumed Liabilities, upon the terms and subject to the conditions set forth herein;

**WHEREAS,** on May 28, 2013 (the "Petition Date"), Seller and MFM Delaware, Inc. ("MFMD") filed voluntary petitions for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**WHEREAS,** Seller and MFMD's chapter 11 bankruptcy cases are being jointly administered under Case No. 13-11359 (PJW) in the Bankruptcy Court (the "Bankruptcy Cases"); and

**WHEREAS,** the transactions contemplated by this Agreement (the "Transactions") will be consummated pursuant to an Approval Order (as defined below) to be entered in the Bankruptcy Cases under Sections 105, 363, 365 and other applicable provisions of the Bankruptcy Code, and the Transactions and this Agreement are subject to the approval of the Bankruptcy Court.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual agreements, covenants, representations, warranties and promises set forth herein, and in order to prescribe the terms and conditions of such purchase and sale, intending to be legally bound, the Parties agree as follows:

1.    **Definitions.**

    1.1.    <u>Definitions.</u>  The following terms, as used herein, have the following meanings:

(a)    "Accounts Receivable" means all accounts and notes receivable (whether current or non-current) of Seller in respect of goods shipped, products sold or services rendered prior to the Closing Date.

(b)    "Acquired Owned Real Property" means all of the real property, together with all Improvements located thereon and all easements, rights of way, servitudes, tenements, hereditaments, appurtenances, privileges and other rights and interests appurtenant thereto, owned in fee by Seller, and any part or parcel thereof, including the real property set forth on Schedule 2.1(a).

(c)    "Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with, such other Person.

(d)    "Business Day" means a day other than Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by Law to close.

(e)    "CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. § 9601 et seq.), and any Laws promulgated thereunder.

(f)    "Claim" means a "claim" as defined in Section 101 of the Bankruptcy Code.

(g)    "Closing Date" means the date of the Closing.

(h)    "Code" means the Internal Revenue Code of 1986, as amended.

(i)    "Committee" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Cases;

(j)    "Confidentiality Agreement" means the Confidentiality Agreement dated June 20, 2013, between Seller and Purchaser.

(k)    "Cure Costs" means all amounts that must be paid and all obligations that otherwise must be satisfied, including pursuant to Sections 365(b)(1)(A) and (B) of the Bankruptcy Code, in connection with the assumption and/or assignment of the Assumed Contracts to Purchaser as provided herein.

(l)    "Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA § 3(3)) and any other benefit or compensation plan, program, agreement, arrangement or payroll practice (whether written or unwritten) maintained, sponsored, or contributed or required to be contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability, other than a Multiemployer Plan.

2

(m)     "Environmental Laws" means, whenever in effect, all federal, state, and local Laws and other provisions having the force or effect of Law, all judicial and administrative Orders and determinations, all contractual obligations and all common Law, in each case concerning public or employee health and safety, pollution or protection of the environment, including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, processing, discharge, Release, threatened Release, control, or cleanup of any Hazardous Substances or wastes (including CERCLA and analogous state Laws).

(n)     "ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

(o)     "ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with Seller for purposes of Code § 414.

(p)     "Factored Accounts Receivable" means any Accounts Receivable that, as of the Closing Date, have been sold by Seller to Bibby Financial Services (Midwest), Inc., pursuant to that certain Ratification Agreement dated as of May 29, 2013.

(q)     "GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

(r)     "Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or Taxing Authority, or arbitral body.

(s)     "Hazardous Substances" means any pollutants, contaminants or chemicals, and any industrial, toxic or otherwise hazardous materials, substances or wastes and any other substance with respect to which liability or standards of conduct may be imposed under any Environmental Laws, including petroleum and petroleum related substances, products, by products and wastes, asbestos, urea, formaldehyde and lead based paint.

(t)     "Improvements" means all buildings, improvements, structures, streets, roads and fixtures located, placed, constructed or installed on or under the Acquired Owned Real Property or the Leased Real Property, including all utilities, fire protection, security, surveillance, telecommunications, computer, wiring, cable, heat, exhaust, ventilation, air conditioning, electrical, mechanical, plumbing and refrigeration systems, facilities, lines, installations and conduits.

(u)     "Independent Accounting Firm" means any of the nationally recognized "big four" accounting firms, as mutually agreed.

(v)     "Intellectual Property Rights" means all of Seller's intellectual property rights (but, in each case, only to the extent such intellectual property rights are

3

transferrable without the consent of any third party), including: (i) patents, patent applications, patent rights, patent disclosures and inventions (whether or not patentable or reduced to practice); (ii) trademarks (registered and at common law), trademark registrations and applications, trade names, logos, trade dress, brand names, service marks (registered and at common law), service mark registrations and applications, websites, domain names and other indicia of source and all goodwill associated therewith; (iii) works of authorship, copyrights, copyright registrations and applications for registration, and moral rights; (iv) know-how, trade secrets, customer lists, proprietary information, proprietary processes and formulae, databases and data collections; (v) all source and object code, software, algorithms, architecture, structure, display screens, layouts, inventions, development tools; and (vi) all documentation and media constituting, describing or relating to the above, including, manuals, memoranda and records.

(w)     "Inventory" means all non-obsolete supplies, goods, finished goods, materials, raw materials, work in process, in-transit materials and stock in trade owned by Seller, whether or not prepaid, and wherever located, held or owned, including all packaging materials, replacement and spare parts and fuels and other similar items that are in use or usable in the Business.

(x)     "Knowledge of Seller" or any other similar knowledge qualification in this Agreement means all facts actually known, after due inquiry, by the following individuals: Matthew A. Crane and Bruce Kosbab.

(y)     "Law" means any law, statute, regulation, rule, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

(z)     "Leased Real Property" means all land, Improvements or other interests in real property leased or subleased by Seller, as lessee, which is used or intended to be used in, or otherwise related to, the Business including the real property set forth on Schedule 1.1(z).

(aa)    "Lien" means, with respect to any property or asset, any mortgage, lien (statutory or otherwise), pledge, security interest, Claim, encumbrance, restriction, charge, instrument, preference, priority, option, or right of first refusal, of any kind or nature, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown. For the avoidance of doubt, the definition of Lien shall not include any license or sublicense of Intellectual Property Rights granted by Seller or any lease or sublease by Seller (as lessor or sublessor) of real property.

(bb)    "Material Adverse Effect" means a material adverse effect on the Business and the Purchased Assets, taken as a whole, excluding any such effect to the extent resulting from or arising in connection with (i) the Transactions or the public announcement thereof; (ii) changes resulting from the commencement and continuation of the Bankruptcy Cases; (iii) the pendency or completion of the Transactions; (iv) any

4

action taken by Seller as required by this Agreement; or (v) actions taken by Seller pursuant to (or as contemplated by) Orders entered by the Bankruptcy Court in the Bankruptcy Cases.

(cc)    "Multiemployer Plan" means any "multiemployer plan" (as defined in ERISA § 3(37)) contributed to by Seller or any ERISA Affiliate or with respect to which Seller or any ERISA Affiliate has any liability.

(dd)    "Order" means any award, decision, decree, order, directive, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

(ee)    "Permits" means licenses, permits, approvals, certificates of occupancy, authorizations, operating permits, registrations, plans and other similar documents and authorizations issued by any Governmental Authority to Seller, in each case to the extent transferable without the consent of any Governmental Authority.

(ff)    "Permitted Liens" means (i) Liens granted by Purchaser at or after the Closing; (ii) non-monetary Liens that do not materially interfere with the ability of Purchaser to own and operate the Purchased Assets in substantially the manner as operated immediately prior to the execution of this Agreement; (iii) Liens that arise under zoning, building codes, land use and other similar Laws, none of which would materially interfere with the ownership or operation by Purchaser of the Purchased Assets following the Closing in substantially the manner as owned and operated immediately prior to the execution of this Agreement; (iv) Liens for Taxes not yet due and payable; (v) with respect to the Leased Real Property, the terms and conditions of the Real Property Leases; and (vi) all covenants, agreements, conditions, easements, restrictions and rights affecting the Acquired Owned Real Property or the Leased Real Property that are reflected in the applicable real estate records.

(gg)    "Person" means an individual, corporation, partnership, limited liability company, association, joint venture, trust or other entity or organization, including a Governmental Authority.

(hh)    "Post-Petition Contracts" means all leases, agreements, binding commitments and contracts entered into by Seller after the Petition Date in the ordinary course of Seller's business or with Bankruptcy Court approval (except any contracts related to money loaned to Seller by any bank or other financial institution or related to the sale of Accounts Receivable to Bibby Financial Services (Midwest), Inc.), including all agreements with vendors, suppliers and customers.

(ii)    "Post-Petition Cure Costs" means all Cure Costs except for Pre-Petition Cure Costs.

(jj)    "Post-Petition Trade Payables" means all trade payables incurred by Seller in the ordinary course of Seller's business after the Petition Date that remain unpaid as of the Closing, and which shall be paid by Seller.

(kk)    "Pre-Closing Tax Period" means (i) any Tax period ending on or before the Closing Date and (ii) with respect to a Tax period that commences before but ends after the Closing Date, the portion of such period up to and including the Closing Date.

(ll)    "Pre-Petition Cure Costs" means all Cure Costs arising from the Seller's failure to pay amounts due and payable prior to the Petition Date.

(mm)    "Property Taxes" means all real and personal property Taxes levied with respect to the Purchased Assets for any Taxable period.

(nn)    "Real Property Leases" means all of Seller's right, title and interest in all leases, subleases, licenses, concessions and other agreements and all amendments, extensions, renewals, guaranties and other agreements with respect thereto and including the right to all security deposits and other amounts and instruments deposited by or on behalf of Seller thereunder, pursuant to which Seller holds a leasehold or subleasehold estate in, or is granted a license or right to use, the Leased Real Property.

(oo)    "Release" has the meaning set forth in CERCLA.

(pp)    "Target Inventory Amount" means an amount equal to $824,186.01, representing the Inventory of Seller as of August 31, 2013, calculated as set forth on Exhibit A.

(qq)    "Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), or (ii) liability for the payment of any amounts of the type described in clause (i) as a result of being party to any agreement or any express or implied obligation to indemnify any other Person.

1.2.    Cross References. Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
| --- | --- |
| Agreement | Preamble |
| Apportioned Obligations | 8.3 |
| Approval Hearing | 7.4(b)(ii) |
| Approval Order | 7.4(c) |
| Assignment and Assumption Agreement | 2.10(a) |
| Assumed Contracts | 2.1(b) |
| Assumed Liabilities | 2.3 |
| Assumed Plans | 9.2(a) |
| Auction | 7.4(b)(ii) |
| Backup Bid | 7.4(b)(iv) |
| Backup Bidder | 7.4(b)(iv) |
| Bankruptcy Cases | Recitals |

6

| | |
|---|---|
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bid Deadline | 7.4(b)(i) |
| Bidding Procedures | 7.4(a) |
| Bidding Procedures Order | 7.4(a) |
| Breakup Fee | 7.4(b)(iii) |
| Business | Recitals |
| Certified Inventory | 2.7(d) |
| Closing | 2.9 |
| End Date | 12.1(c) |
| Estimated Inventory Amount | 2.7(a) |
| Estimated Inventory Statement | 2.7(a) |
| Excluded Assets | 2.2 |
| Excluded Liabilities | 2.4 |
| Final Inventory | 2.7(c) |
| Good Faith Deposit | 2.8(a) |
| Incremental Bid Amount | 7.4(b)(ii) |
| Initial Overbid | 7.4(b)(i) |
| MFMD | Recitals |
| Parent | Preamble |
| Party or Parties | Preamble |
| Petition Date | Recitals |
| Post-Closing Tax Period | 8.3 |
| Prevailing Bid | 7.4(b)(ii) |
| Purchase Price | 2.6(a) |
| Purchased Assets | 2.1 |
| Purchaser | Preamble |
| Qualified Bidder | 7.4(b)(ii) |
| Sale and Bidding Procedures Motion | 7.4(a) |
| Seller | Preamble |
| Taxing Authority | 1.1(qq) |
| Transactions | Recitals |
| Transfer Taxes | 8.2 |
| Transferred Employee | 9.2(c) |
| Transferred Employees' Employment Date | 9.3 |

## 2. <u>Purchase and Sale</u>.

2.1.   <u>Purchase and Sale</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Seller agrees to sell, assign, transfer, convey and deliver to Purchaser, and Purchaser agrees to purchase, acquire and accept from Seller, on an "as is, where is" basis and without any representation or warranty on the part of Seller as to fitness, merchantability or otherwise, all right, title and interest of Seller as of the Closing Date in and to all of Seller's properties and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located and whether or not carried or reflected on the books and records of Seller that are now, or at the time of Closing will be, used or held for use in or otherwise related

to, useful in or necessary for the conduct of, the Business (the "Purchased Assets"), but only to the extent owned, held or primarily used or usable in the conduct of the Business, free and clear of all Liens (other than Permitted Liens and the Assumed Liabilities) to the maximum extent permitted by Section 363 of the Bankruptcy Code.  Subject to Section 2.2, the Purchased Assets purchased hereunder shall include, but shall not be limited to, the following:

(a)    the Acquired Owned Real Property set forth on Schedule 2.1(a), including the water supply system;

(b)    all rights of Seller  under the executory contracts and unexpired leases of Seller that are set forth on Schedule 2.1(b)(i) (collectively, the "Assumed Contracts"); provided, however, notwithstanding any other provision of this Agreement, the term Assumed Contracts shall include all Post-Petition Contracts as set forth on Schedule 2.1(b)(ii);

(c)    all Inventory;

(d)    all tangible personal property (including all equipment set forth on Schedule 2.1(d)(i) owned by Seller on the Closing Date), including all machinery, equipment, farm products, tools, vehicles, computers, mobile phones, personal digital assistants, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, fixtures, furnishings, office supplies, production supplies, other miscellaneous supplies, and other tangible personal property of any kind owned by Seller (including any of the foregoing property that is subject to a capital lease, but only to the extent that Purchaser assumes such capital lease as an Assumed Contract, provided, however, Seller shall exercise the purchase options under such capital leases identified on Schedule 2.1(d)(ii) and pay for the acquisition of such property from the Purchase Price proceeds and convey title of such property to Purchaser) wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Seller or any other space where Seller's properties and or any other assets may be situated;

(e)    all rights of Seller in or under the Assumed Contracts and Assumed Plans, including all pre-payments, deposits and refunds thereunder and any assets maintained pursuant thereto or in connection therewith;

(f)    all Permits set forth on Schedule 2.1(f) to the extent the same may be assigned consistent with their terms;

(g)    all Intellectual Property Rights, including the items set forth on Schedule 2.1(g);

(h)    all cars, trucks, forklifts, other industrial vehicles and other motor vehicles set forth on Schedule 2.1(h);

(i)    all claims, asserted or unasserted, contingent or fixed, known or unknown, against third parties (but no liabilities arising therefrom) related to any

8

warranties, representations, patent infringements, and licensing agreements arising out of the operation of the Purchased Assets;

(j)     all books, records, files and papers of Seller relating solely to the Business or the Purchased Assets, including equipment logs, operating guides and manuals, creative materials, advertising materials, promotional materials, studies, reports, correspondence, financial and accounting records, Tax records and other similar documents and records (all in the state in which such records and information currently exist), provided that Seller shall be entitled to retain copies of such books, records, files and papers;

(k)     all artwork and other graphic medium used in connection with the Purchased Assets in the manufacture of products for Seller's past and present customers;

(l)     except as set forth on Schedules 2.2 (c) and (n), all utility deposits, security deposits, deposits held by parties to the Assumed Contracts, deposits held by vendors or trade creditors, and other deposits of any kind or nature whatsoever; and

(m)     all goodwill directly arising from, related to or resulting from the Business.

2.2.     Excluded Assets. Notwithstanding any other provision of this Agreement to the contrary, the following assets (the "Excluded Assets") shall not be transferred, conveyed, sold or assigned to Purchaser:

(a)     all of Seller's cash and cash equivalents on hand (including all undeposited checks) and in banks or other financial institutions;

(b)     all Accounts Receivable, including the Seller's right to receive any proceeds of the Factored Accounts Receivable;

(c)     all post-petition adequate assurance deposits set forth on Schedule 2.2(c);

(d)     all Claims or causes of action of Seller (except as set forth in Section 2.1(i) hereof) whether arising under the Bankruptcy Code, applicable state Law or otherwise and the proceeds thereof, including actions available to Seller under chapter 5 of the Bankruptcy Code, of whatever kind or nature, and whether asserted or unasserted;

(e)     Seller's corporate seals, stock record books, minute books, and organizational documents;

(f)     any unexpired lease or executory contract not identified in this Agreement as an Assumed Contract;

9

(g)     all insurance policies relating to the Business and all Claims arising under such policies, and all credits, premium refunds, proceeds, causes of action or rights thereunder;

(h)     all rights of Seller arising under this Agreement or in connection with the Transactions;

(i)     any Tax refund or reimbursement due to Seller or its Affiliates for the Pre-Closing Tax Period;

(j)     all amounts owed to Seller by any one or more of Seller's Affiliates;

(k)     account proceeds seized by Writ of Garnishment in favor of Terex Financial Services, Inc. on May 24, 2013;

(l)     any shares of stock or other equity interests in Seller;

(m)     all assets listed on Schedule 2.2(n);

(n)     all bank accounts, deposit accounts, securities accounts, brokerage accounts and other accounts holding any cash, cash equivalents or securities belonging to Seller; and

(o)     all assets, properties and/or rights of Seller not otherwise specifically included in the Purchased Assets.

2.3.    Assumed Liabilities.  Upon the terms and subject to the conditions of this Agreement, Purchaser agrees, effective at the time of the Closing, to assume, pay, perform and discharge, promptly when payment or performance is due or required, the following liabilities and obligations of Seller or the Business (the "Assumed Liabilities"):

(a)     all liabilities and obligations related to or arising in connection with the Purchased Assets that accrue after the Closing;

(b)     all liabilities and obligations of Seller related to or arising under the Assumed Contracts, Permits, and Intellectual Property Rights that accrue after the Closing;

(c)     all Pre-Petition Cure Costs required as a condition to the assumption and assignment of any Assumed Contracts.  Seller shall pay all Post-Petition Cure Costs;

(d)     all costs and expenses necessary in connection with providing "adequate assurance of future performance" with respect to the Assumed Contracts (as contemplated by Section 365 of the Bankruptcy Code);

10

(e)     all costs, expenses and liabilities pro rated to Purchaser as set forth in this Agreement (including Section 8.3);

(f)     all accrued but unpaid vacation liabilities owed by Seller to any Transferred Employee (as defined below);

(g)     all liabilities and obligations of Seller related to or arising in connection with the Assumed Plans (as provided in Section 9.2) that accrue after the Closing; and

(h)     as contemplated by Section 8.2, one-half of the Transfer Taxes, if any.

2.4.     Excluded Liabilities.     Notwithstanding any other provision of this Agreement to the contrary, Purchaser is assuming only the Assumed Liabilities and is not assuming any other Claim against or obligation of Seller of whatever nature, whether presently in existence or arising hereafter, including Post-Petition Trade Payables. All such other Claims and obligations, whether known or unknown, direct or contingent, in litigation or threatened, or not yet asserted, shall be retained by and remain obligations and liabilities of Seller (all such liabilities and obligations not being assumed being herein referred to as the "Excluded Liabilities").

2.5.     Assumption/Assignment of Contracts and Rights.     To the maximum extent permitted by the Bankruptcy Code, the Assumed Contracts and Assumed Plans shall be assumed by Seller and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code. Purchaser shall have sole responsibility for: (a) paying any Pre-Petition Cure Costs due in connection with the assumption and assignment of the Assumed Contracts; and (b) providing "adequate assurance" of Purchaser's future performance under the Assumed Contracts. Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any Purchased Asset or any right thereunder if an attempted assignment, without the consent of a third party, would constitute a breach or in any way adversely affect the rights of Purchaser or Seller thereunder. If such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363 and/or 365 of the Bankruptcy Code, then such Purchased Assets shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price.

2.6.     Purchase Price; Allocation of Purchase Price.

(a)     Subject to adjustment after the Closing Date as provided in Section 2.7, in addition to the assumption of the Assumed Liabilities, in consideration for the sale, transfer and delivery of the Purchased Assets, at the Closing, Purchaser shall deliver to Seller SEVEN MILLION DOLLARS ($7,000,000) (the "Purchase Price") by wire transfer of immediately available federal funds to a bank account (or accounts) as shall be designated in writing no later than two (2) days prior to the Closing Date by Seller to Purchaser, which amount shall be reduced by the amount of the Good Faith Deposit as a credit against the Purchase Price in accordance with Section 2.8(b).

11

(b)    Purchaser and Seller agree that the Purchase Price, applicable Assumed Liabilities and other relevant items shall be allocated in accordance with Section 1060 of the Code and the regulations thereunder as shown on the allocation schedule set forth on Schedule 2.6. If Seller notifies Purchaser in writing that Seller objects to one or more items reflected in the allocation schedule, Seller and Purchaser shall negotiate in good faith to resolve such dispute; provided, however, that if Seller and Purchaser are unable to resolve any dispute with respect to the allocation schedule within thirty (30) days following the Closing Date, such dispute shall be resolved by an Independent Accounting Firm. The fees and expenses of such Independent Accounting Firm shall be borne equally by Seller and Purchaser. Purchaser and Seller shall file all tax returns and information reports in a manner consistent with the allocation schedule. Any adjustments to the Purchase Price pursuant to Section 2.7 herein shall be allocated in a manner consistent with the allocation schedule.

2.7.    Adjustment of Purchase Price.

(a)    Within five (5) Business Days prior to the Closing Date, Seller shall deliver to Purchaser a statement setting forth Seller's good faith estimate (the "Estimated Inventory Statement") of the Inventory (the "Estimated Inventory Amount") as of the Closing Date. The Estimated Inventory Statement shall be accompanied by a reasonably detailed overview of Seller's calculations. The Inventory shall be calculated by Seller in the same manner, in accordance with, and using the same assumptions and methodology as the calculation of the Target Inventory Amount, as indicated on Exhibit A.

(b)    In the event that an Estimated Inventory Amount is more than the Target Inventory Amount, the Purchase Price shall be increased on a dollar-for-dollar basis by the amount by which the Estimated Inventory Amount is more than the Target Inventory Amount. In the event that an Estimated Inventory Amount is less than the Target Inventory Amount, the Purchase Price shall be decreased on a dollar-for-dollar basis by the amount by which the Estimated Inventory Amount is less than the Target Inventory Amount.

(c)    Within three (3) days of the Closing Date, Purchaser shall conduct an inventory of the Inventory as of the Closing Date in the same manner, in accordance with, and using the same assumptions and methodology as the calculation of the Target Inventory Amount, as indicated on Exhibit A. Within four (4) days after the Closing Date, Purchaser shall prepare, or cause to be prepared, issue and deliver to Seller, a statement of the amount of the Inventory as of the Closing Date (the "Final Inventory"), which shall include a statement of the amounts and categories of the Final Inventory consistent with the form of Exhibit A.

(d)    If the Final Inventory, as conclusively determined as set forth in Section 2.7(f) (the Final Inventory as so determined, the "Certified Inventory"), is less than the Target Inventory Amount, then Seller shall pay to Purchaser the amount of such deficiency. Any payment pursuant to this Section 2.7(d) shall be made within five (5) Business Days following the date on which the Final Inventory becomes final pursuant to

12

Section 2.7(f). Any payment made pursuant to this Section 2.7(d) shall be made by wire transfer of immediately available federal funds to an account designated by Purchaser, and such amount shall be deemed an allowed first priority administrative expense claim of Seller's estate.

(e)     If the Certified Inventory is greater than the Target Inventory Amount, then Purchaser shall pay to Seller the amount of such excess. Any payment pursuant to this Section 2.7(e) shall be made within five (5) Business Days following the date on which the Final Inventory becomes final pursuant to Section 2.7(f). Any payment made pursuant to this Section 2.7(e) shall be made by wire transfer of immediately available federal funds to an account designated by Seller.

(f)     Unless Seller notifies Purchaser in writing within fifteen (15) days after receipt by Seller of the Final Inventory of any objections thereto (specifying in reasonable detail the basis therefor), such statement shall be final and binding for all purposes. If Seller timely notifies Purchaser of any such objection, Purchaser and Seller shall attempt in good faith to reach an agreement as to the matter in dispute. If the Parties shall have failed to resolve any such dispute within ten (10) Business Days after receipt of timely notice of such objection, then any such disputed matter may, at the election of Purchaser or Seller, be submitted to and determined by an Independent Accounting Firm. The fees and expenses of such Independent Accounting Firm incurred in resolving the disputed matter shall be equitably apportioned by such accountants based on the extent to which Purchaser, on the one hand, or Seller, on the other hand, is determined by such accountants to be the prevailing Party or Parties in the resolution of such disputed matters. The Final Inventory shall, after resolution of any dispute pursuant to this Section 2.7(f), be final, binding and conclusive on all Parties hereto.

(g)     Purchaser and Seller shall have access during normal working hours to each other's books, records, and work papers used to determine the Estimated Inventory Amount and the Final Inventory, and to discuss the same with each other's personnel and accounting and financial professionals.

2.8.   Good Faith Deposit.

(a)     Contemporaneously with the execution of this Agreement, Purchaser shall deposit with BBVA Compass Bancshares, Inc. cash in immediately available federal funds by wire transfer an amount equal to $700,000 (the "Good Faith Deposit"), to be applied as provided in Section 2.8(b). The Good Faith Deposit shall be held in escrow by BBVA Compass Bancshares, Inc. in an interest bearing bank account (interest is payable to Purchaser).

(b)     The Good Faith Deposit shall be remitted to Seller (i) at the Closing as a credit against the Purchase Price, (ii) if this Agreement is terminated pursuant to Section 12.1(f), or (iii) if this Agreement is terminated pursuant to Section 12.1(c) and any of the conditions of Section 10.3 have not been satisfied. Except as described in the previous sentence, the Good Faith Deposit shall be returned to Purchaser within two (2) Business Days after any termination of the Agreement pursuant to Section

12.1. If Purchaser is not the successful bidder at the Auction, or the designated Backup Bidder, the Good Faith Deposit shall be refunded within two (2) Business Days after the Approval Hearing. If Purchaser is designated by Seller to be the Backup Bidder, the Purchaser shall remain obligated under this Agreement (for the Purchase Price or any amount overbid at Auction by Purchaser at the Auction) until ten (10) Business Days after the End Date.

2.9. Closing. The closing (the "Closing") of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities shall take place at the offices of King & Spalding LLP, 1180 Peachtree Street, Atlanta, Georgia, no later than five (5) Business Days after satisfaction of the conditions set forth in Section 10 (other than those requiring a delivery, or the taking of other action, at the Closing), or at such other time or place as Purchaser and Seller may agree. At the Closing, there will be a customary proration of prepaid rent, real and personal property taxes, utilities, local business or other license fees or taxes, merchants' association dues and other similar periodic charges payable with respect to the Purchased Assets consistent with the terms of this Agreement. Each Party shall pay its own attorneys' fees.

2.10. Deliveries by Seller. At the Closing, Seller will deliver or cause to be delivered to Purchaser (unless delivered previously) the following:

(a) a Bill of Sale, Assignment and Assumption Agreement substantially in the form attached hereto as Exhibit B (the "Assignment and Assumption Agreement"), duly executed by Seller;

(b) duly executed special warranty deeds transferring fee simple title to the Acquired Owned Real Property to Purchaser, in form and substance reasonably satisfactory to Purchaser and Seller;

(c) originals (or, to the extent originals are not available, copies) of all Assumed Contracts (together with all material amendments, supplements or modifications thereto) to the extent not already located at the Acquired Owned Real Property or the Leased Real Property;

(d) physical possession of all of the Purchased Assets capable of passing by delivery with the intent that title in such Purchased Assets shall pass by and upon delivery;

(e) a duly executed assignment agreement or agreements transferring the Intellectual Property Rights to Purchaser, in form and substance reasonably satisfactory to Purchaser;

(f) an affidavit from Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Laws issued pursuant to Section 1445 of the Code stating that Seller is not a foreign person as defined in Section 1445 of the Code;

(g) certificates of title and title transfer documents to all titled motor vehicles included within the Purchased Assets; and

14

(h)     all other documents, instruments and writings reasonably requested by Purchaser to be delivered by Seller at or prior to the Closing pursuant to this Agreement, in each case in form and substance reasonably acceptable to Seller.

2.11.   Deliveries by Purchaser.  At the Closing, Purchaser will deliver or cause to be delivered to Seller (unless previously delivered) the following:

(a)     the Purchase Price less the Good Faith Deposit;

(b)     the Assignment and Assumption Agreement, duly executed by Purchaser;

(c)     a letter instructing BBVA Compass Bancshares, Inc. to release the Good Faith Deposit to Seller, duly executed by Purchaser; and

(d)     all other documents, instruments and writings reasonably requested by Seller to be delivered by Purchaser at or prior to the Closing pursuant to this Agreement.

**3.     Representations and Warranties of Seller.**  Subject to the terms, conditions and limitations set forth in this Agreement, Seller hereby represents and warrants to Purchaser as of the date of this Agreement as follows:

3.1.   Organization.  Seller is a corporation validly existing under the Laws of the State of Delaware, and has the corporate power and authority to own, lease and operate the Purchased Assets, and to carry on in all material respects the Business as now being conducted.

3.2.   Corporate Authorization.  The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions are within Seller's corporate powers and have been duly authorized by all necessary actions on the part of Seller.  Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, this Agreement constitutes a valid and binding agreement of Seller that is enforceable in accordance with its terms.

3.3.   Governmental Authorization.  The execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions by Seller require no action by or in respect of, or filing with, any Governmental Authority other than consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court.

3.4.   Noncontravention.  Subject to entry by the Bankruptcy Court of the Bidding Procedures Order and the Approval Order in the Bankruptcy Cases, the execution, delivery and performance by Seller of this Agreement and the consummation of the Transactions do not and will not (a) violate Seller's articles or certificates of incorporation, as amended, or bylaws, (b) assuming compliance with the matters referred to in Section 3.3, materially violate any applicable Law, (c) except as to matters which would not reasonably be expected to have a Material Adverse Effect, constitute a default under or give rise to any right of termination, cancellation or acceleration of any right or obligation or to a loss of any benefit relating to any Purchased Asset to which Seller is entitled under any provision of any agreement or other

15

instrument binding upon such Seller except for breaches and defaults referred to in Section 365(b)(2) of the Bankruptcy Code, or (d) result in the creation or imposition of any Lien on any Purchased Asset, except for Permitted Liens and Assumed Liabilities or Liens that will be released at or prior to Closing.

3.5.    Required Consents.  Except for consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, there is no agreement or other instrument binding upon Seller requiring a consent or other action by any Person as a result of the execution, delivery and performance of this Agreement.

3.6.    Litigation.  Except as disclosed on Schedule 3.6, as of the date hereof, there is no action, suit, investigation or legal or administrative proceeding pending against, or to the Knowledge of Seller, threatened against or affecting, the Purchased Assets (by any Governmental Authority or Person), including real estate tax assessment appeals, which is reasonably likely to have a Material Adverse Effect or which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

3.7.    Permits.  To the Knowledge of Seller, Schedule 2.1(f) sets forth a list of all Permits required to conduct and operate the Business in a manner consistent with the current practices of Seller.  Except as set forth on Schedule 3.7, to the Knowledge of Seller, (a) Seller is in material compliance with the terms and requirements of each such Permit; and (b) no written notice of violation of any Permit has been received from any Governmental Authority and no proceeding is pending seeking to revoke or limit any such Permit.

3.8.    Intellectual Property Rights.  Schedule 2.1(g) sets forth an accurate and complete list of all registered Intellectual Property Rights included in the Purchased Assets.  To the Knowledge of Seller, there exist no outstanding challenges to the ownership and use by Seller of the Intellectual Property Rights, nor any alleged infringements of such Intellectual Property Rights by third parties.  None of the Intellectual Property Rights included in the Purchased Assets have been licensed by Seller to any other Person.

3.9.    Compliance with Laws and Court Orders.  To the Knowledge of Seller, Seller is not in violation of any Law applicable to the Purchased Assets or the conduct of the Business, except for violations which would not reasonably be expected to have a Material Adverse Effect.

3.10.    Environmental Matters.  Other than as described on Schedule 3.10: (a) Seller has not received any notice from any Governmental Authority or third party of any violation of or failure to comply with any Environmental Laws with respect to the Acquired Owned Real Property which to the Knowledge of Seller remains uncorrected, or of any obligation to undertake or bear the cost of any remediation with respect to the Acquired Owned Real Property which to the Knowledge of Seller remains unperformed; and (b) to the Knowledge of Seller, the Acquired Owned Real Property is in compliance, in all material respects, with applicable Environmental Laws.

3.11.    Real Property.  Schedule 2.1(a) sets forth the address and description of all Acquired Owned Real Property and Schedule 1.1(z) sets forth the address and description of all

16

Leased Real Property of Seller.  With respect to each parcel of Acquired Owned Real Property, except as set forth on Schedule 2.1(a), (a) the applicable Seller has fee simple title free and clear of all encumbrances, except for Permitted Liens and Liens that will be released at or prior to Closing; (b) there are no leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any Person the right of use or occupancy of any portion of such Acquired Owned Real Property; (c) there are no outstanding options, rights of first offer, or rights of first refusal to purchase such Acquired Owned Real Property (other than the right of Purchaser pursuant to this Agreement), or any portion thereof or interest therein; and (d) there are no condemnation or eminent domain proceedings pending or, to the Knowledge of Seller, threatened with respect to all or any part of the Acquired Owned Real Property.

3.12.   Employee Benefit Plans.

(a)   Schedule 3.12(a) sets forth a complete and accurate list of Seller's Employee Benefit Plans and any Multiemployer Plans. Seller has provided to, or made available to, Purchaser true and correct copies of (i) each Employee Benefit Plan (including all plan documents and amendments thereto); (ii) all current trust documents, investment management contracts, custodial agreements and insurance contracts relating thereto, (iii) the current summary plan description and each summary of material modifications thereto, (iv) the annual report (Form 5500 and all schedules thereto) for the most recent plan year, (v) the most recent Internal Revenue Service determination or opinion letter, if applicable, and (vi) the annual report, actuarial report, financial statement and trustee report for the most recent plan year.

(b)   To the Knowledge of Seller, each Employee Benefit Plan has been established, maintained, funded and administered in material compliance with its terms, all applicable requirements of ERISA, the Code, and other applicable Laws. Each Employee Benefit Plan which is intended to be qualified within the meaning of Code § 401(a) has received a favorable determination letter from the Internal Revenue Service upon which it may rely, or is comprised of a master or prototype plan that has received a favorable opinion letter from the Internal Revenue Service, and, to the Knowledge of Seller, nothing has occurred that is reasonably likely to adversely affect the qualified status of such Employee Benefit Plan.

(c)   No Employee Benefit Plan is subject to Title IV or Section 302 of ERISA or Section 412 of the Code, and no Seller or any ERISA Affiliate contributes to or has any liability with respect to any such plan.

(d)   As of the date of this Agreement, neither the Seller nor any ERISA Affiliate is obligated to make any contributions to any Multiemployer Plan. As of the date of this Agreement, no Seller or ERISA Affiliate has incurred any unsatisfied withdrawal liability (contingent or otherwise) with respect to any Multiemployer Plan, and no Seller or ERISA Affiliate is bound by any contract or has any liability described in Section 4204 of ERISA.

(e)   With respect to each Employee Benefit Plan, all payments, premiums, contributions, distributions, reimbursements or accruals for all periods (or partial periods) ending prior to or as of the Closing Date shall have been timely made in accordance with the terms of the applicable Employee Benefit Plan and applicable Law.

(f)    There are no pending audits or investigations by any Governmental Authority involving any Employee Benefit Plan, and no pending or threatened claims (except for individual claims for benefits payable in the normal operation of the Employee Benefit Plans), suits or proceedings involving any Employee Benefit Plan, any trust or other funding medium thereof, fiduciary thereof or service provider thereto, nor, to the Knowledge of Seller, is there any reasonable basis for any such claim, suit or proceeding.

(g)    No Employee Benefit Plan provides benefits, including, without limitation, death or medical benefits, beyond termination of service or retirement other than (i) coverage mandated by law or (ii) death or retirement benefits under an Employee Benefit Plan qualified under Section 401(a) of the Code.

(h)    The Seller's execution of, and performance of the transactions contemplated by this Agreement will not: (i) result in any payment or benefit, or increase in payments or benefits or acceleration in the timing of payments or benefits becoming due to any current or former employee, director, officer, or independent contractor of Seller, (ii) limit the right to merge, amend or terminate any Employee Benefit Plan or (iii) result in the payment or provision of an "excess parachute payment" under Section 280G of the Code, whether under an Employee Benefit Plan or otherwise.

(i)    Except as to matters which would not reasonably be expected to have a Material Adverse Effect, each Employee Benefit Plan that constitutes a "non-qualified deferred compensation plan" within the meaning of Section 409A of the Code, complies in both form and operation with the requirements of Section 409A of the Code so that no amounts paid pursuant to any such Benefit Plan is subject to Tax under Section 409A of the Code.

(j)    Except as to matters which would not reasonably be expected to have a Material Adverse Effect, the Seller has performed all material obligations required to be performed by it and is not in any material respect in default under or in violation of any Employee Benefit Plan, nor, to the knowledge of the Seller, has there been any such material default or violation by any other party to any Employee Benefit Plan.

3.13.    Personnel Matters    Schedule 3.13 contains an accurate and complete list of the names, job classifications, dates of hire, base compensation, and any supplemental or bonus compensation (including any retention bonus arrangements) for all salaried employees of Seller. Seller is not party to any employment agreement, collective bargaining agreement, or union contract with respect to any employees.

3.14.    Sufficiency of and Title to the Purchased Assets.    Seller will have at Closing good and marketable title to, or a valid leasehold interest in (or license or other right to use), all of the Purchased Assets. Upon consummation of the Transactions at the Closing, Purchaser will have acquired good, valid and marketable title in and to, or a valid leasehold interest in, each of the Purchased Assets, free and clear of all Liens (other than Assumed Liabilities and Permitted Liens) to the maximum extent permitted by Section 363 of the Bankruptcy Code.

3.15.   Certain Fees. Except for the fees and expenses of Pharus Securities, LLC, no agent, broker, investment banker, or other person or firm acting on behalf of Seller or under its authority is or will be entitled to any broker's or finder's fee or any other commission or similar fee or the reimbursement of expenses, directly or indirectly, from Seller in connection with this Agreement or the Transaction.

3.16.   "AS IS" TRANSACTION. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT UPON THE CLOSING DATE, PURCHASER WILL ACCEPT THE PURCHASED ASSETS "AS IS," "WHERE IS," AND "WITH ALL FAULTS" WITHOUT ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR ANY OTHER WARRANTY, EXPRESS OR IMPLIED, EXCEPT AS OTHERWISE EXPRESSLY STATED IN THIS AGREEMENT.

**4.**   **Representations and Warranties of Purchaser and Parent.**   Purchaser represents and warrants to Seller, and Parent represents and warrants to Seller in connection with its obligations under Section 13.11 below, in each case as follows:

4.1.   Organization. Purchaser is a Georgia corporation duly organized, validly existing and in good standing and has all requisite authority to carry on its business. Parent is a Spanish corporation duly organized, validly existing and in good standing and has all requisite authority to carry on its business.

4.2.   Corporate Authorization. The execution, delivery and performance by Purchaser and Parent of this Agreement and the consummation of the Transactions are within the requisite power and authority of Purchaser and Parent and have been duly authorized by all necessary actions on the part of Purchaser and Parent, as applicable. This Agreement constitutes a valid and binding agreement of Purchaser and Parent that is enforceable in accordance with its terms.

4.3.   Governmental Authorization. The execution, delivery and performance by Purchaser of this Agreement and the consummation of the Transactions by Purchaser require no action by or in respect of, or filing with, any Governmental Authority other than (a) consents, approvals or authorizations of, or declarations or filings with, the Bankruptcy Court, and (b) any such action or filing as to which the failure to make or obtain would not have a material adverse effect on Purchaser or its ability to close the Transactions.

4.4.   Noncontravention. Neither the execution and delivery of this Agreement nor the consummation of the Transactions will (a) conflict with or result in any breach of any provision of organizational documents of Purchaser or Parent, as applicable; (b) require any filing with, or the obtaining of any permit, authorization, consent or approval of, any Governmental Authority; (c) violate, conflict with or result in a default (or any event which, with notice or lapse of time or both, would constitute a default) under, or give rise to any right of termination, cancellation or acceleration under, any of the terms, conditions or provisions of any note, mortgage, other evidence of indebtedness, guarantee, license, agreement, lease or other contract, instrument or obligation to which Purchaser or Parent, as applicable, is a party or by which Purchaser, Parent or any of their respective assets may be bound; or (d) violate any Law applicable to Purchaser or Parent, excluding from the foregoing clauses (b), (c) and (d) such

requirements, violations, conflicts, defaults or rights (i) which would not adversely affect the ability of Purchaser to consummate the Transactions or Parent to perform its obligations under Section 13.11, or (ii) which become applicable as a result of any acts or omissions by, or the status of or any facts pertaining to, Seller.

4.5.    Financing.  Purchaser has sufficient cash, available lines of credit or other sources of immediately available funds to enable it to make payment of the Purchase Price and any other amounts to be paid by it hereunder.

4.6.    Litigation.  There is no action, suit, investigation or proceeding pending against or, to the knowledge of Purchaser, threatened against or affecting Purchaser before any Governmental Authority which in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions.

4.7.    Certain Fees.  Purchaser has not employed any broker, finder, investment banker, or other intermediary or incurred any liability for any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees in connection with this Agreement or the Transactions.

4.8.    Inspections; No Other Representations.  Purchaser is an informed and sophisticated purchaser, and has engaged expert advisors, experienced in the evaluation and purchase of properties and assets such as the Purchased Assets and assumption of liabilities such as the Assumed Liabilities as contemplated hereunder.  Purchaser has undertaken such investigation and has been provided with and has evaluated such documents and information as it has deemed necessary to enable it to make an informed and intelligent decision with respect to the execution, delivery and performance of this Agreement.  Purchaser acknowledges that Seller has given Purchaser reasonable and open access to the key employees, documents and facilities of the Business.  Purchaser acknowledges and agrees that the Purchased Assets are being sold on an "as is, where is" basis and Purchaser agrees to accept the Purchased Assets and the Assumed Liabilities in the condition they are in on the Closing Date based on its own inspection, examination and determination with respect to all matters and without reliance upon any express or implied representations or warranties of any nature made by or on behalf of or imputed to Seller, except as expressly set forth in this Agreement.  Without limiting the generality of the foregoing, Purchaser acknowledges that Seller makes no representation or warranty with respect to (a) any projections, estimates or budgets delivered to or made available to Purchaser of future revenues, future results of operations (or any component thereof), future cash flows or future financial condition (or any component thereof) of the Business or the future prospects or operations of the Business or (b) any other information or documents made available to Purchaser or its counsel, accountants or advisors with respect to the Business, except as expressly set forth in this Agreement.

5.    **Covenants of Seller**.  Seller agrees that:

5.1.    Conduct of the Business.  From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 or the Closing Date, except (i) as disclosed on Schedule 5.1, (ii) as may be required by the Bankruptcy Court, (iii) for the consequences resulting from the continuation of the Bankruptcy Cases, or (iv) as may be

required or contemplated by this Agreement, (1) Seller shall use commercially reasonable efforts to (A) conduct its business in the ordinary course consistent with past practice and (B) comply in all material respects with all applicable Laws (including, without limitation, maintaining any Permits held by Seller and required for the current operation of the Business) and all Assumed Contracts; and (2) without limiting the generality of the foregoing, Seller will not:

> (a)    with respect to the Business, acquire a material amount of assets (including without limitation Inventory) from any other Person;

> (b)    except in the ordinary course of business substantially consistent with past practice, sell, transfer, lease, license, mortgage, encumber (unless such Lien is removed prior to the Closing) or otherwise dispose of any Purchased Assets;

> (c)    materially amend, modify or terminate any material contract;

> (d)    agree or commit to do any of the foregoing; or

> (e)    take any action that would reasonably be expected to cause the failure of any condition contained in Section 10.2 (other than actions taken by Seller in connection with the discharge of its fiduciary duties during the Bankruptcy Cases).

5.2.    Access to Information.  From the date hereof until the earlier of the termination of this Agreement pursuant to Section 12.1 or the Closing Date, Seller shall reasonably afford, and shall cause its officers, employees, attorneys and other agents to reasonably afford, to Purchaser and its counsel, accountants and other representatives, access (at reasonable times during normal business hours) to officers and other employees of Seller for the purposes of evaluating the Business and all properties, books, accounts, records and documents of, or relating to, the Business, subject to the terms of the Confidentiality Agreement.  All access to the officers, employees, properties, books, accounts, records and/or documents of the Business shall be arranged on behalf of Seller by representatives of Pharus Securities, LLC.

5.3.    Notices of Certain Events.  Seller shall promptly notify Purchaser of:

> (a)    any notice or other written communication from any Person alleging that the consent of such Person is or may be required in connection with the consummation of the Transactions;

> (b)    any material written communication from any Governmental Authority in connection with or relating to the Transactions; and

> (c)    the commencement of any actions, suits, investigations or proceedings relating to Seller or the Business that, if pending on the date of this Agreement, would have been required to have been disclosed pursuant to Section 3.6.

**6.**    **Covenants of Purchaser.**  Purchaser agrees that:

6.1.    Confidentiality.  Prior to the Closing Date and after any termination of this Agreement, the Confidentiality Agreement shall remain in full force and effect.  After the

Closing has occurred, the Confidentiality Agreement shall be terminated to the extent relating to the Purchased Assets, Assumed Liabilities or the employees of Seller, and shall, with respect to any of the Excluded Assets or Excluded Liabilities, remain in full force and effect.

      6.2.   Access. On and after the Closing Date, upon reasonable advance notice, Purchaser will afford promptly to Seller and its counsel, advisors and other agents reasonable access during normal business hours to Purchaser's properties, books, records, employees, auditors and counsel to the extent necessary for financial reporting and accounting matters, employee benefits matters, the preparation and filing of any Tax returns, reports or forms, the defense of any Tax audit, Claim or assessment, the reconciliation of Claims in the Bankruptcy Cases, to permit Seller to determine any matter relating to its rights and obligations hereunder, any other reasonable business purpose related to the Excluded Assets or Excluded Liabilities, or in connection with addressing any other issues arising in connection with or relating to the Bankruptcy Cases; provided, however, that any such access by Seller shall not unreasonably interfere with the conduct of the business of Purchaser. Seller will hold, and will use its commercially reasonable efforts to cause its officers, directors, employees, accountants, counsel, consultants, advisors and agents to hold, in confidence, unless compelled to disclose by judicial or administrative process or by other requirements of Law, all confidential documents and information concerning Purchaser or the Business provided to them pursuant to this Section 6.2.

      6.3.   Insurance. To the extent that any insurance policies of Seller or any of its Affiliates cover any loss, liability, Claim, damage or expense relating to any Purchased Assets and such insurance policies continue after the Closing to permit Claims to be made thereunder with respect to events occurring prior to the Closing, Purchaser shall cooperate with Seller in good faith in submitting and pursuing such Claims for the benefit of Seller.

      **7.**   **Covenants of Purchaser and Seller.** Purchaser and Seller agree that:

      7.1.   Efforts; Further Assurances. Subject to the terms and conditions of this Agreement, Purchaser and Seller will use their respective commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable under applicable Laws to consummate the Transactions contemplated by this Agreement; provided, however, Seller shall be entitled to take such actions as are required in connection with the discharge of its fiduciary duties during the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets). Seller and Purchaser agree to execute and deliver such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to vest in Purchaser good title to the Purchased Assets or to evidence the assumption by Purchaser of the Assumed Liabilities.

      7.2.   Certain Filings. Seller and Purchaser shall cooperate with one another in good faith (a) in determining whether any action by or in respect of, or filing with, any Governmental Authority is required, or any actions, consents, approvals or waivers are required to be obtained from parties to any Assumed Contracts or Intellectual Property Rights, in connection with the consummation of the Transactions, and (b) in taking such actions or making any such filings, furnishing information required in connection therewith and seeking timely to obtain any such actions, consents, approvals or waivers.

7.3.   <u>Public Announcements</u>.   Prior to the Closing, Purchaser shall not make any public announcements or statements concerning the Transactions without the prior written consent of Seller.   Purchaser acknowledges and agrees that Seller may provide copies of this Agreement to parties in interest in the Bankruptcy Cases and to those parties to whom Seller determines it is necessary to provide copies in connection with soliciting higher or better bids for the Purchased Assets or as otherwise necessary or desirable in connection with the Bankruptcy Cases.   Seller also shall be entitled to file copies with the Bankruptcy Court or as otherwise required by Law and shall be entitled to publish notice of the contemplated Transactions in any newspaper selected by Seller.

7.4.   <u>Bankruptcy Issues</u>.

(a)   <u>Filing of Sale and Bidding Procedures Motion</u>.   Within three (3) Business Days of the date of this Agreement, Seller shall file with the Bankruptcy Court a motion (the "<u>Sale and Bidding Procedures Motion</u>") seeking, among other things, the entry of (i) the Approval Order, and (ii) an Order (the "<u>Bidding Procedures Order</u>") approving the bidding procedures set forth in <u>Section 7.4(b)</u> (the "<u>Bidding Procedures</u>").

(b)   <u>Bidding Procedures</u>.   In the Sale and Bidding Procedures Motion, Seller shall seek, among other things, approval of the following Bidding Procedures, which shall be incorporated into the Bidding Procedures Order:

(i)   <u>Bid Deadline and Initial Overbids</u>.   Any third party (other than Purchaser) that is interested in acquiring the Purchased Assets must submit an "<u>Initial Overbid</u>" in conformance with this <u>Section 7.4(b)</u> at or prior to October 21, 2013 (the "<u>Bid Deadline</u>").   A bid received after the Bid Deadline shall not constitute an Initial Overbid.   Any such Initial Overbid must:

(A)   Contain a signed definitive asset purchase agreement with the exhibits and schedules thereto (together with a copy of the signed agreement that is marked to show changes from this Agreement) with, at a minimum, the following requirements: (w) having substantially identical terms and conditions as this Agreement except with higher and better consideration; (x) containing terms and conditions in the aggregate no less favorable to Seller's estate than the terms and conditions in this Agreement (provided that no Initial Overbid shall provide for the payment to the overbidder of any breakup fee, topping fee, termination fee, expense reimbursement or other similar arrangement); (y) provide for a purchase price in an amount equal to or greater than the sum of (1) the Purchase Price, (2) the Breakup Fee, and (3) $100,000; and (z) not be subject to any (1) financing contingency, (2) contingency relating to the completion of unperformed due diligence, (3) contingency relating to the approval of the overbidder's board of directors or other internal approvals or consents, or (4) any conditions precedent to the overbidder's

23

obligation to purchase the Purchased Assets other than those included in this Agreement;

(B)    Include a cashiers' or certified check in the amount of ten percent (10%) of the purchase price set forth in such Initial Overbid to be held as a deposit (it being understood that the deposit may also be sent by wire transfer of immediately available funds to Seller's counsel to be held in its escrow account);

(C)    To the extent not previously provided to Seller, be accompanied by evidence satisfactory to Seller in its commercially reasonable discretion (after consulting with the Committee) that the overbidder is willing, authorized, capable and qualified financially, legally and otherwise, of unconditionally performing all obligations under the Agreement (or its equivalent) in the event that it submits the Prevailing Bid (as defined below) at the Auction;

(D)    Remain open and irrevocable until twenty (20) days after the entry of an order by the Bankruptcy Court approving a definitive agreement providing for the sale of the Purchased Assets; and

(E)    Seller shall provide copies of the Initial Overbids to Purchaser's counsel within 24 hours after the Bid Deadline.

(ii)    <u>Auction</u>. In the event that Seller timely receives a conforming Initial Overbid from a prospective purchaser as described above (a "<u>Qualified Bidder</u>"), then Seller will conduct an auction (the "<u>Auction</u>") with respect to the sale of the Purchased Assets. In order to participate in the Auction, each prospective purchaser shall be required to comply with the requirements of the Bidding Procedures and to submit an Initial Overbid that is timely and that complies in all respects with the Bidding Procedures. At the Auction, Qualified Bidders and/or Purchaser may submit successive bids in increments of at least $50,000 greater than the prior bid (the "<u>Incremental Bid Amount</u>") (provided that at the Auction, the Seller shall have the discretion, after consulting with the Committee, to modify the Incremental Bid Amount) for the purchase of the Purchased Assets until there is only one offer that Seller determines, subject to Bankruptcy Court approval, is the highest or best offer (the "<u>Prevailing Bid</u>"). When bidding at the Auction, Purchaser shall receive a "credit" in the amount of the Breakup Fee. All bidding for the Purchased Assets will be concluded at the Auction and there will be no further bidding at the Bankruptcy Court hearing held in the Bankruptcy Cases to approve the highest or best bid for the Purchased Assets (the "<u>Approval Hearing</u>"). If no conforming Initial Overbid from a Qualified Bidder shall have been received at or prior to the Bid Deadline, the Auction will not be held and the Approval Hearing will proceed with respect to this Agreement.

(iii)    Breakup Fee.  Upon the consummation of a sale of all or substantially all of the Purchased Assets to any third party (other than Purchaser) who submits a Prevailing Bid for the Purchased Assets, or if Seller commits a material breach of the Agreement or unilaterally abandons the consummation of the transactions contemplated by the Agreement, Seller shall pay to Purchaser cash or other immediately available funds in an amount equal to $240,000 (the "Breakup Fee"); provided, however, the Breakup Fee shall not be due and payable if Purchaser has committed a material breach of this Agreement prior to the consummation of such sale to the third party.  The Parties agree that the Breakup Fee shall be the full and liquidated damages of Purchaser arising out of any termination of this Agreement pursuant to Section 12.1(g).  The provisions of this Section 7.4(b)(iii) shall survive any termination of this Agreement pursuant to Section 12.1(g).  The Breakup Fee shall be treated as an administrative expense claim in the Bankruptcy Cases, shall be paid to Purchaser within three (3) Business Days following the closing of such sale to any third party, and shall be paid to Purchaser prior to the payment of the proceeds of such sale to any third party asserting a Lien on the Purchased Assets (and no Lien of any third party shall attach to the portion of the sale proceeds representing the Breakup Fee).

(iv)    Backup Bid.  At the conclusion of the Auction, Seller shall (after consulting with the Committee) identify and certify the bid that constitutes the second highest or best offer for the Purchased Assets (the "Backup Bid" and the Qualified Bidder submitting such bid, the "Backup Bidder").  The Backup Bidder may be required by Seller to close on the Backup Bid within twenty (20) days of the conclusion of the Auction.  In the event that the Backup Bidder fails to close on the transaction contemplated in the Backup Bid, Seller shall be permitted to retain the Backup Bidder's good faith deposit as liquidated damages.

(c)    Bankruptcy Court Approval of Sale.  Seller and Purchaser shall each use their commercially reasonable efforts, and shall cooperate, assist and consult with each other, to secure the entry of an Order (the "Approval Order") of the Bankruptcy Court in the Bankruptcy Cases (i) approving this Agreement, (ii) authorizing the sale of the Purchased Assets pursuant to Section 363 of the Bankruptcy Code, (iii) authorizing the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, (iv) authorizing the Transactions and (v) providing that this Agreement and the Transactions are undertaken by Purchaser and Seller at arm's length, without collusion, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, that Purchaser and Seller are entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code are not applicable; provided, however, Seller shall be entitled to take such actions as may be required in connection with the discharge of its fiduciary duties in the Bankruptcy Cases (including soliciting higher or better offers for the Purchased Assets).  In connection with the assumption and assignment of the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code, Purchaser shall take all actions required to provide "adequate assurance of future performance" by Purchaser under the Assumed Contracts after the Closing.  Purchaser shall cooperate in good faith with Seller in connection with seeking entry of the Approval Order, and Purchaser shall provide evidence (including direct testimony) at the Approval Hearing sufficient to support determinations that this Agreement and the Transactions

25

are undertaken by Purchaser and Seller at arm's length, without collusion, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code, that Purchaser and Seller are entitled to the protections of Section 363(m) of the Bankruptcy Code, and that the provisions of Section 363(n) of the Bankruptcy Code are not applicable. Seller and Purchaser shall consult with one another in good faith regarding pleadings that either of them intends to file, or positions either of them intend to take, with the Bankruptcy Court in connection with or that might reasonably affect the Bankruptcy Court's entry of the Approval Order.

       7.5.   Notices. If at any time (a) Purchaser becomes aware of any material breach by Seller of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Seller, or (b) Seller becomes aware of any breach by Purchaser of any representation, warranty, covenant or agreement contained herein and such breach is capable of being cured by Purchaser, the Party becoming aware of such breach shall promptly notify the other Party, in accordance with Section 13.1, in writing of such breach. Upon such notice of breach, the breaching Party shall have until the earlier of (y) ten (10) days after receiving such notice, and (z) the End Date, to cure such breach prior to the exercise of any remedies in connection therewith.

**8.**    **Tax Matters.**

       8.1.   Tax Cooperation. Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax returns, the making of any election relating to Taxes, the preparation for any audit by any Taxing Authority, and the prosecution or defense of any Claim, suit or proceeding relating to any Tax. Seller and Purchaser shall cooperate with each other in good faith in the conduct of any audit or other proceeding relating to Taxes involving the Purchased Assets or the Business.

       8.2.   Transfer Taxes. Any and all sales, use, transfer, stamp, recording or other similar taxes or charges (the "Transfer Taxes") assessed at Closing or at any time thereafter on the transfer of any Purchased Assets shall be split and paid equally by Purchaser and Seller. Purchaser and Seller shall cooperate in providing each other with any appropriate resale exemption certifications and other similar documentation.

       8.3.   Property Taxes. All Property Taxes for a Tax period which includes (but does not end on) the Closing Date (collectively, the "Apportioned Obligations") shall be apportioned between Seller, on the one hand, and Purchaser, on the other hand, based on the number of days of such Tax period included in the Pre-Closing Tax Period and the number of days of such Tax period after the Closing Date (with respect to any such Tax period, the "Post-Closing Tax Period"). Seller shall be liable for the proportionate amount of such Property Taxes that is attributable to the Pre-Closing Tax Period, and Purchaser shall be liable for the proportionate amount of such Property Taxes that is attributable to the Post-Closing Tax Period.

       8.4.   Apportionment. Apportioned Obligations or Transfer Taxes shall be timely paid, and all applicable filings, reports and returns shall be filed, as provided by applicable Law. The paying Party shall be entitled to reimbursement from the non-paying Party

in accordance with Section 8.2 or 8.3, as the case may be.  Upon payment of any such Apportioned Obligation or Transfer Tax, the paying Party shall present a statement to the non-paying Party setting forth the amount of reimbursement to which the paying Party is entitled under Section 8.2 or 8.3, as the case may be, together with such supporting evidence as is reasonably necessary to calculate the amount to be reimbursed.  The non-paying Party shall make such reimbursement promptly but in no event later than ten (10) days after the presentation of such statement.  Any payment not made within such time shall bear interest at the rate per annum equal to the rate of interest announced by JP Morgan Chase N.A. from time to time as its base rate in New York City.

**9.**    **Employee Matters**.

9.1.    Employees and Offers of Employment.

(a)    Purchaser has been informed of the current salary, wages and benefit levels of Seller's employees, as well as the expected accrued outstanding amounts as of the Closing Date. As of the Closing Date, Purchaser shall (i) offer employment to all employees of Seller who are employed in connection with the Business at the same (or better) salary or wage and benefit levels and on such other terms and conditions as are in effect at Closing, and (ii) assume all obligations and liabilities with respect thereto that accrue after the Closing Date. Purchaser is not assuming any existing employment contracts with any employees of Seller, but shall offer in good faith the terms of new employment conditions that are mutually acceptable to Purchaser and the employee. Seller shall retain all obligations and liabilities, if any, for (i) any claim (including, without limitation, for unpaid wages, unemployment compensation, employee contract or severance agreement, or resolved but unpaid legal claims, or employee benefits matters) relating to the Seller employees' employment by Seller prior to the Closing Date, (ii) any lawsuit, administrative charge, arbitration, proceeding, or written demand or notice pertaining to Seller employees and arising out of such Seller employees' employment with Seller prior to the Closing Date, whether or not filed or asserted prior to the Closing Date, and (iii) any worker's compensation or other claims arising from any injury or illness occurring prior to the Closing Date.

(b)    Purchaser shall maintain employee records transferred to Purchaser hereunder for a period of not less than four (4) years and during that period will afford Seller reasonable access to such records during Purchaser's normal business hours. Purchaser shall maintain the confidentiality of such records and limit access thereto in a manner consistent with Purchaser's treatment of its employee records and applicable Law.

9.2.    Employee Plans.

(a)    Purchaser shall assume all rights, liabilities and obligations arising from and after the Closing for the Seller's Employee Benefit Plans (the "Assumed Plans"). Purchaser and Seller shall take such actions as are necessary and reasonably requested by the other Party to cause Purchaser to assume sponsorship of the Assumed Plans as of the Closing Date and to effect the transfer of all assets and benefit liabilities of the Assumed Plans together with all related trust, insurance policies and administrative services agreements, effective as soon as practicable following the Closing Date; provided, however, that Purchaser shall not be assuming or be

27

responsible for any liabilities or obligations arising with respect to or in connection with such Assumed Plans to the extent such liabilities or obligations arose prior to the Closing Date or with respect to any employee or former employee of the Sellers who does not become a Transferred Employee (except to cause payment for any claim appropriately covered by a transferred insurance policy or any other payment under an Assumed Plan to which such employee or former employee is otherwise entitled by Law).

(b)    On and following the Closing Date, Seller and Purchaser shall reasonably cooperate in all matters reasonably necessary to effect the transactions contemplated by Section 9.2(a), including exchanging information and data relating to employee benefits and employee benefit plan coverage, except as would result in the violation of any Law.

(c)    Each Seller employee who becomes an employee of Purchaser (a "Transferred Employee") shall continue, or otherwise be eligible, to participate in the Assumed Plans, and be eligible to participate in any other Purchaser employee benefit plans made available to such employees, in accordance with the terms of those plans.  For each Assumed Plan and any other employee benefit plan, policy and practice sponsored or maintained by Purchaser for which a Transferred Employee is eligible to participate, Purchaser shall grant, or cause to be granted, to all such employees from and after the Closing Date credit for all service with Seller, prior to the Closing Date for all purposes (including eligibility to participate, vesting credit, eligibility to commence benefits, and benefit accrual) to the same extent as such employees were entitled to such service credit under the Assumed Plan (or comparable Employee Benefit Plan in which the employees participated before the Closing Date, if any), except to the extent such credit would result in a duplication of service credit or benefits.

(d)    The Seller shall be responsible for the payment of any severance payment or benefits that become due to any current or former employee, officer, director, member, partner or independent contractor as a result of the termination of such individual by the Seller or Affiliate thereof.

(e)    Notwithstanding anything to the contrary in this Agreement, the provisions of this Section 9.2 are solely for the benefit of the Parties to this Agreement, and no current or former employee or any other individual associated therewith shall be regarded for any purpose as a third-party beneficiary of this Agreement, and nothing in this Section 9.2 shall be deemed an amendment of any Employee Benefit Plan or be construed to limit the right of Purchaser to amend or terminate any Assumed Plan or other employee benefit plan, program or arrangement, to the extent such amendment or termination is permitted by the terms of the applicable plan.  Nothing herein, expressed or implied, shall confer upon any employee any rights or remedies of any nature or kind whatsoever in regard to an Assumed Plan, under or by reason of any provision of this Agreement.

9.3.    Workers' Compensation.    Seller shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence sustained by Seller's employees prior to the Closing Date.  Purchaser shall be liable for all workers' compensation claims arising out of injuries with an identifiable date of occurrence, sustained by Transferred Employees on and after the dates (hereinafter, "Transferred Employees' Employment Date") Purchaser hires them, including injuries sustained by a Transferred

28

Employee on or after the Transferred Employees' Employment Date that are aggravations, exacerbations or re-injuries of medical conditions or diagnoses resulting from injuries that were sustained before the Transferred Employees' Employment Date. Seller shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, originating from within Seller's facilities and which are alleged to have been sustained or contracted prior to the Closing Date, provided such claims are filed with the appropriate workers' compensation authority within forty-five (45) days after the Transferred Employees' Employment Date. Purchaser shall be liable for all workers' compensation claims arising out of injuries or occupational diseases without an identifiable date of occurrence or exposure, which are alleged to have been sustained or contracted after the Transferred Employees' Employment Date, provided that, in the case of any such injuries or diseases allegedly sustained before the Transferred Employees' Employment Date, such claims are filed with the appropriate workers' compensation authority more than forty-five (45) days after the Transferred Employees' Employment Date.

**10.    Closing Conditions.**

10.1.    Conditions to Obligations of Purchaser and Seller. The obligations of Purchaser and Seller to consummate the Closing are subject to the satisfaction at or before Closing of each and every one of the following conditions:

(a)    The Bankruptcy Court shall have entered the Approval Order in the Bankruptcy Cases, and the Bankruptcy Court shall have waived the stay imposed by Rule 6004(h) of the Federal Rules of Bankruptcy Procedure as to the Approval Order, authorizing the Transactions and approving this Agreement under Sections 105(a), 363 and 365 of the Bankruptcy Code, in form and substance reasonably acceptable to Seller and Purchaser, and the Approval Order shall contain findings that Purchaser acquired the Purchased Assets in good faith, for fair value, in an arm's length transaction, and as of the Closing Date the Approval Order shall be in full force and effect, shall not then be stayed, and shall not have been vacated or reversed; and

(b)    No injunction, stay or similar Order issued by any Governmental Authority shall be in effect that restrains, enjoins, stays or prohibits the consummation of the Transactions.

10.2.    Conditions to Obligations of Purchaser. The obligation of Purchaser to consummate the Closing is subject to the satisfaction (or waiver by Purchaser) of the following further conditions:

(a)    Seller shall have performed in all material respects all of its obligations hereunder required to be performed by Seller on or prior to the Closing Date;

(b)    the representations and warranties of Seller contained in this Agreement shall be true and correct at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct as of such earlier date), with only such exceptions as would not in the aggregate reasonably be expected to have a Material Adverse Effect;

(c)     Seller shall not be in default in any material respect under the provisions of this Agreement;

(d)     Purchaser shall have received all of the documents required to be delivered by Seller under Section 2.10; and

(e)     The Land Lease and Mineral Mining Agreement dated April 30, 1997, by and between Palmer Resources, LLC (f/k/a MFM Industries, Inc., a Florida corporation) and MFM Industries, Inc., a Delaware corporation (f/k/a MFM Acquisition Corp., a Delaware corporation) shall be rejected by order of the Bankruptcy Court.

10.3.    Conditions to Obligations of Seller.    The obligation of Seller to consummate the Closing is subject to the satisfaction (or waiver by Seller) of the following further conditions:

(a)     Purchaser shall have performed in all material respects all of its obligations hereunder required to be performed by it at or prior to the Closing Date;

(b)     the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing Date, as if made at and as of such date (or to the extent such representations and warranties speak as of an earlier date, they shall be true and correct in all material respects as of such earlier date);

(c)     Seller shall have received all documents they may reasonably request relating to the existence of Purchaser and the authority of Purchaser for this Agreement, all in form and substance reasonably satisfactory to Seller; and

(d)     Seller shall have received all of the documents required to be delivered by Purchaser under Section 2.11.

## 11.    Survival; Indemnification.

11.1.    Survival.    The (a) representations and warranties of Seller, and (b) covenants and agreements of Seller that by their terms are to be performed before Closing, contained in this Agreement or in any certificate or other writing delivered in connection herewith, shall not survive the Closing.    The covenants and agreements of Seller contained herein that by their terms are to be performed after Closing shall survive the Closing for such terms.

11.2.    Indemnification.    Each of Purchaser and Seller agrees to indemnify the other with respect to any investment banking fees, financial advisory fees, brokerage fees, finders' fees, or other similar fees which are alleged to be due and payable with respect to the Transactions and which are asserted as a result of the actions of the indemnifying party.    There shall be no post-Closing indemnification of Purchaser by Seller with respect to any matter not set forth in this Agreement.

12.    <u>Termination</u>.

      12.1.   <u>Grounds for Termination</u>. This Agreement may be terminated at any time prior to the Closing:

         (a)     by mutual written agreement of Seller and Purchaser;

         (b)     by Purchaser if the Bankruptcy Cases are converted to Chapter 7 cases, or the Bankruptcy Court appoints a trustee or examiner;

         (c)     by Seller or Purchaser, if the Closing shall not have been consummated on or before October 31, 2013 (the "<u>End Date</u>"), unless the Party seeking termination is in breach of its obligations hereunder;

         (d)     by Seller or Purchaser, if any condition set forth in <u>Section 10.1</u> is not satisfied, and such condition is incapable of being satisfied by the End Date;

         (e)     by Purchaser, if any condition set forth in <u>Section 10.2</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date; or

         (f)     by Seller, if any condition set forth in <u>Section 10.3</u> has not been satisfied, and such condition is incapable of being satisfied by the End Date;

         (g)     by Seller, if (i) Seller executes a definitive agreement with a third party (other than Purchaser) for the acquisition of all or substantially all the Purchased Assets, and (ii) the Bankruptcy Court enters an Order in the Bankruptcy Cases approving such definitive agreement.

The Party desiring to terminate this Agreement pursuant to this <u>Section 12.1</u> (other than pursuant to <u>Section 12.1(a)</u>) shall give notice of such termination to the other Party in accordance with <u>Section 13.1</u>.

      12.2.   <u>Effect of Termination</u>. If this Agreement is terminated as permitted by <u>Section 12.1</u>, such termination shall be without liability of any Party (or any stockholder, director, officer, employee, agent, consultant or representative of such Party) to the other Party to this Agreement except as expressly provided in <u>Sections 2.8(b)</u>, <u>7.4(b)</u>, and <u>12.4</u>. The provisions of <u>Sections 2.8</u>, <u>6.1</u>, <u>7.4(b)(iii)</u>, <u>11.2</u>, <u>12.2</u>, <u>12.3</u>, <u>12.4</u>, <u>13.1</u>, <u>13.4</u>, <u>13.5</u>, <u>13.6</u>, <u>13.8</u>, <u>13.9</u> and <u>13.10</u> shall survive any termination hereof pursuant to <u>Section 12.1</u>.

      12.3.   <u>Fees and Expenses</u>. Except as otherwise set forth expressly herein, all costs and expenses incurred by the Parties in connection with obtaining Bankruptcy Court approval and consummation of this Agreement and the Transactions contemplated hereby shall be paid by the Party incurring such cost or expense.

      12.4.   <u>Exclusive Remedies</u>. Effective as of Closing, except for fraud or willful misconduct by Seller, Purchaser waives irrevocably any rights and Claims Purchaser may have against Seller, whether in Law or in equity, relating to (a) any breach of a representation, warranty, covenant or agreement contained herein and occurring on or prior to the Closing, or (b)

31

the Purchased Assets, the Assumed Liabilities or the Business.    Purchaser and Seller acknowledge and agree that if this Agreement is terminated pursuant to Section 12.1, the provisions of Section 12.2 and this Section 12.4 set forth the sole and exclusive remedies of the Parties.  Purchaser and Seller further acknowledge and agree that if this Agreement is terminated by Seller pursuant to either (y) Section 12.1(f), or (z) Section 12.1(c) (provided that any of the conditions of Section 10.3 have not been satisfied), then, in addition to Seller's remedies set forth in Section 12.2, Seller shall also retain any and all claims, rights, remedies, prayers for damages and causes of action, whether arising in Law or in equity, arising from or related to any breach of this Agreement by Purchaser, including the right to specific performance.

**13.    Miscellaneous.**

13.1.    Notices.    All notices, requests and other communications to any Party hereunder shall be in writing (including facsimile transmission) and shall be given,

> if to Purchaser, to:

>> Tolsa, S.A.
>> P.E. Las Mercedes
>> C/Campezo, 1 Edificio 4-2a Planta
>> 28022 Madrid
>> Attention:  Cristina Pascual
>> Fax:  34 923220128

> with a copy to (which shall not constitute notice):

>> Hunton & Williams LLP
>> 200 Park Avenue
>> New York, New York  10166
>> Attention: Andrew Kamensky
>> Fax: (212) 309-1100

> if to Seller, to:

>> MFM Industries, Inc.
>> 3300 SW 34th Avenue, Suite 112
>> Ocala, FL 34474
>> Attention:  Matthew A. Crane

> with copies to (which shall not constitute notice):

>> King & Spalding LLP
>> 1185 Avenue of the Americas
>> New York, NY 10036
>> Attention: Arthur Steinberg
>> Fax: (212) 556-2222

and

The Official Committee of Unsecured Creditors
C/O Michael Barrie
222 Delaware Avenue, Suite 801
Wilmington, Delaware 19801-1611
Fax: (302) 442-7068

All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

13.2.  <u>Waivers</u>.  No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided shall be cumulative.

13.3.  <u>Successors and Assigns</u>.  The provisions of this Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and assigns; <u>provided</u>, <u>however</u>, that no Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement without the written consent of the other Party; provided further that Purchaser shall have the right to designate, no later than three (3) Business Days prior to the Closing Date, one or more wholly-owned subsidiaries or Affiliates to take title to the Purchased Assets at the Closing, so long as Purchaser remains liable for all of its obligations hereunder and provided such designation does not violate any Consent or other approval which has been obtained by Seller.

13.4.  <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the Laws of the State of Delaware and any applicable provisions of the Bankruptcy Code, without regard to the principles of conflicts of Law that would provide for application of another Law.

13.5.  <u>Jurisdiction</u>.

(a)      Prior to the closing of the Bankruptcy Cases, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions shall be brought exclusively in the Bankruptcy Court, and each of the Parties hereby irrevocably consents to the jurisdiction of the Bankruptcy Court (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in the Bankruptcy Court or that any such suit, action or proceeding which is brought in the Bankruptcy Court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of the Bankruptcy Court. Without limiting the foregoing, each

33

Party agrees that service of process on such Party as provided in <u>Section 13.1</u> shall be deemed effective service of process on such Party.

          (b)      After the closing of the Bankruptcy Cases, except as otherwise expressly provided in this Agreement, the Parties hereto agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Transactions may be brought in any court having subject matter jurisdiction over such suit, action or proceeding, and that any cause of action arising out of this Agreement shall be deemed to have arisen from a transaction of business in the State of Delaware, and each of the Parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action or proceeding and irrevocably waives, to the fullest extent permitted by Law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding in any such court or that any such suit, action or proceeding which is brought in any such court has been brought in an inconvenient forum. Process in any such suit, action or proceeding may be served on any Party anywhere in the world, whether within or without the jurisdiction of any such court. Without limiting the foregoing, each Party agrees that service of process on such Party as provided in <u>Section 13.1</u> shall be deemed effective service of process on such Party.

        13.6.  <u>Waiver of Jury Trial</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS.

        13.7.  <u>No Third Party Beneficiaries</u>.  No provision of this Agreement is intended to confer upon any Person other than the Parties hereto any rights or remedies hereunder.

        13.8.  <u>Entire Agreement; Amendments; Counterparts</u>.  This Agreement (including the Schedules and Exhibits hereto) and the Confidentiality Agreement set forth the entire agreement among the Parties with respect to the subject matter hereof and may be amended only by a writing executed by Purchaser and Seller. This Agreement may be executed in counterparts, each of which when taken together shall constitute an original. This Agreement shall become effective when each Party hereto shall have received a counterpart hereof signed by the other Party hereto.

        13.9.  <u>Headings, Interpretation</u>.  The headings contained in this Agreement are for convenience of reference only and shall not affect the meaning or interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of authorship of any provisions of this Agreement.

        13.10.  <u>Disclosure Schedules</u>.  The Parties acknowledge and agree that (i) the Schedules to this Agreement may include certain items and information solely for informational purposes for the convenience of Purchaser and (ii) the disclosure by Seller of any matter in the Schedules shall not be deemed to constitute an acknowledgment by Seller that the matter is

required to be disclosed by the terms of this Agreement or that the matter is material. If any Schedule discloses an item or information, the matter shall be deemed to have been disclosed in all other Schedules, notwithstanding the omission of an appropriate cross-reference to such other Schedules.

13.11. <u>Guaranty</u>. Parent hereby irrevocably guarantees each and every covenant and obligation of Purchaser and the full and timely performance of Purchaser's obligations under the provisions of this Agreement. This is a guaranty of payment and performance, and not of collection, and Parent acknowledges and agrees that this guaranty is full, irrevocable and unconditional, and no release or extinguishments of Purchaser's liabilities (other than in accordance with the terms of this Agreement), whether by decree in any bankruptcy proceeding or otherwise, will affect the continuing validity and enforceability of this guaranty. Parent hereby waives, for the benefit of Seller, (i) any right to require Seller as a condition of payment or performance of Parent to proceed against Purchaser or pursue any other remedies whatsoever and (ii) to the fullest extent permitted by law, any defenses or benefits that may be derived from or afforded by law that limit the liability of or exonerate guarantors or sureties, except to the extent that any such defense is available to Purchaser. Parent understands that Seller is relying on this guaranty in entering into this Agreement. Parent may not assign any of its agreements, obligations or rights under this Agreement, in whole or in part, without the prior written consent of Seller. This Section 13.11 shall survive the termination of this Agreement until all obligations of Purchaser hereunder have been timely and fully performed.

*[Signature page follows.]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**TOLSA USA, INC.**

By: _____

Name: Enrique Gómez Navarro

Title: Vice President


**MFM INDUSTRIES, INC.**

By: _____
        Matthew A. Crane
        President & CEO


**Solely for purposes of Section 4 and Section 13.11:**

**TOLSA, S.A.**

By: _____

Name: María José de Larrea García Morato

Title: President

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**TOLSA USA, INC.**

By: _____

Name: _____

Title: _____

**MFM INDUSTRIES, INC.**

By: _____

Matthew A. Crane
President & CEO

**Solely for purposes of Section 4 and Section 13.11:**

**TOLSA, S.A.**

By: _____

Name: _____

Title: _____

**EXHIBIT A**
Purchase Price Adjustment
Calculation of Inventory[1]

| Category | Target Inventory Amount as of Aug. 31, 2013 |
|---|---|
| Crude Clay | $    4,407.88 |
| Bulk Clay | 47,974.24 |
| Bentonite | 55,377.93 |
| Dry Fuel | 10,327,93 |
| Packaging Supplies | 573,873.17 |
| Finished Goods *(incl. purchased goods)* | 132,224.86 |
| **Total Inventory** | **$  824,186.01** |

---

1   For the purpose of determining any purchase price adjustment, inventory will be calculated consistent with the Seller's past practice, by identifying specific quantities of all the materials, finished goods and purchased goods held by the Seller as of a given day (e.g., the date of closing) and applying the values per item generated by the Seller's perpetual inventory accounting system.

**EXHIBIT B**

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT**

THIS BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement") is entered into between MFM INDUSTRIES, INC. ( "Seller") and TOLSA, S.A., a Spanish corporation ("Purchaser"), this _____ day of October, 2013 (the "Effective Date").

WHEREAS, pursuant to that certain Asset Purchase Agreement dated as of October __, 2013 (the "Asset Purchase Agreement") by and between Seller and Purchaser, Seller agreed to sell to Purchaser and Purchaser agreed to purchase from Seller, for the consideration and upon the terms and conditions set forth in the Asset Purchase Agreement, all of Seller's right, title and interest in and to the Purchased Assets, as the same are described in the Asset Purchase Agreement, free and clear of all Liens (other than Permitted Liens and Assumed Liabilities) pursuant to Sections 105, 363 and 365 of the Bankruptcy Code;

WHEREAS, pursuant to the Asset Purchase Agreement, Seller has agreed to assign and transfer certain rights and agreements to Purchaser, and Purchaser has agreed to assume the Assumed Liabilities as partial consideration for the Purchased Assets; and

WHEREAS, capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

NOW, THEREFORE, pursuant to the Asset Purchase Agreement and in consideration of the promises contained therein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is hereby agreed that:

1.    Transfer of Acquired Assets.  Upon the terms and conditions of the Asset Purchase Agreement, Seller does hereby assign, transfer, convey, grant, sell, bargain, set over, alien, remise, release, deliver and confirm unto Purchaser, and Purchaser hereby accepts from Seller, all of the Seller's assets, properties, rights, titles and interests in and to the Purchased Assets in accordance with the terms of the Asset Purchase Agreement.

2.    Assumption and Assignment.  As of the Effective Date, Seller has assumed pursuant to Section 365 of the Bankruptcy Code the Assumed Contracts and hereby assigns, grants, conveys, sells, transfers and sets over (collectively, the "Assignment") to Purchaser all of Seller's right, title, benefit, privileges and interest in and to, and all of Seller's burdens, obligations and liabilities in connection with, each of the Assumed Contracts and the Assumed Liabilities.  Effective as of the Effective Date, Purchaser hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to perform and discharge all of the liabilities of Seller to be observed, performed, paid or discharged from and after the Closing, in connection with the Assumed Contracts and the Assumed Liabilities.

3.     <u>Conflict with Asset Purchase Agreement</u>.  The Asset Purchase Agreement is incorporated herein by reference and shall continue in full force and effect as though set forth herein at length to the extent provided for in the Asset Purchase Agreement.  To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of the Asset Purchase Agreement, the Asset Purchase Agreement shall govern and control.

4.     <u>Governing Law; Counterparts</u>.  This Agreement and all documents, instruments and agreements executed and delivered pursuant to the terms and provisions hereof shall be governed by and construed in accordance with the Bankruptcy Code, and to the extent not inconsistent with the Bankruptcy Code, the laws of the State of Delaware without regard to conflicts of laws principles that would require the application of any other law.  This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which together will constitute one and the same agreement.

5.     <u>Further Assurances</u>.  If at any time after the delivery of this instrument any further action is necessary to carry out the purposes of this Agreement, Seller will take such further actions (including the execution and delivery of such further instruments and documents) as Purchaser may reasonably request.

6.     <u>Successors and Assigns</u>.  This Agreement shall be binding upon the Seller and its respective successors and assigns, effective immediately upon its delivery to Purchaser.  This Agreement shall be binding upon Purchaser and its successors and assigns, effectively immediately upon delivery of this Agreement to Seller.

*[Signature pages follow.]*

2

IN WITNESS WHEREOF, Seller and Purchaser have caused this Agreement to be executed and delivered as of the date first above written.

**SELLER:**

_____
Witness

MFM INDUSTRIES, INC.,
a Delaware corporation

By:_____
　　　Matthew A. Crane
　　　President & CEO

*[Additional signature page follows.]*

*Signature Page to Bill of Sale, Assignment and Assumption Agreement*

**PURCHASER:**

_____ _____
Witness

TOLSA USA
a Georgia corporation

By: _____
     Name:
     Title:

*Signature Page to Bill of Sale, Assignment and Assumption Agreement*